# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| KEVIN D. and HILARY S., individually and on behalf of J.D., a minor, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No. 3:19-cv-00934** |
| BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA and the GROUP MEDICAL BENEFITS PLAN for the EMPLOYEES OF NELSON RILEY & SCARBOROUGH, L.L.P., | ) ) ) ) ) ) ) | **Judge Aleta A. Trauger** |
| Defendants. | ) | |

## MEMORANDUM

Plaintiffs Kevin D. and Hilary S., individually and on behalf of their son J.D., a minor, bring suit against defendants BlueCross BlueShield of South Carolina[1] ("BCBSSC") and the Group Medical Benefits Plan for the Employees of Nelson Mullins Riley & Scarborough, L.L.P.[2] ("Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq.* The plaintiffs assert (1) a claim for denial of benefits under 29 U.S.C. § 1132(a)(1)(B);[3] and (2) a claim for violations of the Mental Health Parity and Addiction Equity

---

[1] This defendant is incorrectly identified in the Complaint as "Blue Cross and Blue Shield of South Carolina." (*See* Answer, Doc. No. 5, at 1 n.1.)

[2] This defendant is incorrectly identified in the Complaint as "Group Medical Benefits Plan for the Employees of Nelson Riley & Scarborough L.L.P." (Answer, Doc. No. 5, at 1 n.2.)

[3] 29 U.S.C. § 1132 is also known as ERISA § 502. The usual convention for citing to ERISA among practitioners and the Department of Labor is to cite to the Act itself (*e.g.*, ERISA § 502), while courts typically (but not always) cite to the corresponding section of the United States

Act ("MHPAEA" or the "Parity Act"), which is enforceable under ERISA.

Now before the court are (1) the plaintiffs' Motion for Summary Judgment and Memorandum in Support (Doc. No. 49), which the court construes as a motion for judgment on the administrative record, insofar as it contests the denial of benefits, *see* 29 U.S.C. § 1132(a), and as a Rule 56 motion with respect to the Parity Act claim; (2) the Plan's Motion for Judgment on the Administrative Record (Doc. No. 53), filed with a supporting Memorandum of Law (Doc. No. 54); and (3) defendant BCBSSC's Motion for Judgment on the Administrative Record (Doc. No. 55), also filed with a separate Memorandum (Doc. No. 56).

For the reasons set forth herein, the court will grant the defendants' Motions for Judgment and deny the plaintiffs' Motion for Summary Judgment.

## I.    REVIEW OF THE RECORD[4]

The Plan was, at all relevant times, a self-funded health plan maintained by Nelson Mullins Riley & Scarborough, LLP ("Nelson Mullins"). The Plan identifies Nelson Mullins as both the Plan Sponsor and the Plan Administrator. (AR 793–94, AR 844.) BCBSSC was the third-party claims administrator, and Companion Benefit Alternatives, Inc. ("CBA"), a separate behavioral healthcare company affiliated with BCBSSC (*see* Compl., Doc. No. 2 ¶ 5), administered requests from providers for mental and behavioral health services on behalf of Plan participants and beneficiaries. (*See* AR 718, 784.)[5]

---

Code. (*e.g.*, 29 U.S.C. § 1132). Regrettably, the section numbers of ERISA and the United States Code do not correspond. In this opinion, the court will cite only to the provisions as codified.

[4] All material facts herein are from the Administrative Record, which has been filed with the court at Docket Numbers 52, 52-1, 52-2, 52-3, 52-4, 51-1, and 51-2. The court cites to the Administrative Record (AR) by the Bates number pagination assigned by the parties rather than by the pagination assigned by the court's electronic docketing system.

[5] Confusingly, the Plan in one place identifies BCBSSC as the Plan Administrator. (*See* AR 844.) Elsewhere, the Plan states that BCBSSC is the claims administrator that administered claims on behalf of Nelson Mullins as the employer and fiduciary. (*See* AR 784.) The

In 2016, as relevant here, the Plan provided coverage for outpatient and inpatient mental health services, including treatment at residential treatment centers. (AR 767, 809, 813.) However, for any services to be covered under the Plan, whether for physical or mental health, the services had to be "medically necessary." (AR 803–04.) The Plan defined "Medically Necessary/Medical Necessity" as:

> [H]ealthcare services that a Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease or its symptoms, and that are:
>
> 1. In accordance with generally accepted standards of medical practice;
>
> 2. Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and,
>
> 3. Not primarily for the convenience of the patient or Provider and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature recognized by the relevant medical community, Physician Specialty Society recommendations and the views of Providers practicing in relevant clinical areas and any other relevant factors.

(AR 792.)

The Plan expressly excluded coverage for certain long-term care services, including "[l]ong-term acute or chronic psychiatric care," as well as "therapeutic schools, wilderness/boot camps, therapeutic boarding homes, half-way house and therapeutic group homes." (AR 814, 820.) It also excluded coverage for long-term care for physical, non-medical conditions, such as care to assist a covered beneficiary with activities of daily living, and "custodial or long-term care." (AR

---

Administrative Services Agreement between Nelson Mullins and BCBSSC also makes this clear. (*See, e.g.*, AR 723 ("Purchaser [Nelson Mullins] retains all authority, responsibility, and liability for its Group Health Plan and its operation, and BCBSSC is only authorized to act on behalf of the Purchaser as expressly stated in this Agreement or the Plan of Benefits . . . .").)

820.) At the same time, however, it provided coverage for long-term treatment of medical conditions at skilled nursing facilities and long-term acute-care hospital stays. (AR 790, 813.) The Plan defined "Long-Term Acute Care Hospital" as

> a long-term, acute care facility [that] provides highly skilled nursing, therapy and medical treatment to Members (typically over an extended period of time) although such Members may no longer need general acute care typically provided in a Hospital. A Long-Term Acute Care Hospital is primarily engaged in providing diagnostic services and medical treatment to Members with chronic diseases or complex medical conditions. The term Long-Term Acute Care Hospital does not include chronic care institutions or facilities that primarily provide custodial, rehabilitative or long-term care . . . .

(AR 790.)

CBA supplied Plan Utilization Management Criteria used for assessing whether specific mental health services were medically necessary. As specifically relevant here, CBA's Plan Utilization Management Criteria identified specific factors that had to be met in order for admission to, continued stay at, and discharge from a residential treatment center to be deemed medically necessary. (AR 1–4.) The Continued Stay Review Criteria identified by CBA—all of which were required to be met in order for a continued stay to be approved—included:

1) The patient's condition continues to meet admission criteria[6] and this level of

---

[6] The Admission Criteria include:

1) A DSM diagnosis, which is the primary focus of active daily treatment.

2) There should be a reasonable expectation that the illness, condition or level of functioning will be stabilized and improved, and that a short-term, residential service will have a likely benefit on the behaviors/symptoms that are required for this level of care, and that the patient will be able to return to outpatient treatment.

3) The treatment is not primarily social, custodial, interpersonal or respite care and is individualized and not determined by a programmatic timeframe. It is expected that the patient will be prepared to receive a significant amount of care in the community.

4) The patient is manifesting acute behavioral health symptoms which represent deterioration from his or her baseline status that could result in harm and cannot be managed outside of a 24-hour structured setting.

care remains necessary to treat the intensity, frequency and duration of current behaviors and symptoms.

2) There is compliance with all aspects of the treatment plan, unless clinically precluded as documented by the facility.

3) Treatment plan and documentation reflect opportunities for the patient to practice skills gained in residential treatment setting. There is evidence of documented weekly outings and family/therapeutic passes of increasing frequency and intensity, unless clinically precluded as documented by the facility.

4) There is a reasonable expectation of further improvement in the targeted acute behavioral health symptom(s) with continued treatment at this level of care that only this level of care can provide.

5) If treatment progress is not evident, then there is documentation of treatment plan revisions to address lack of progress and there is fair likelihood that the patient will demonstrate progress with these changes.

6) Active discharge planning is documented and updated weekly with attention given to family issues, living situation, follow-up care and other issues, as dictated by the clinical condition.

7) Weekly family sessions by a licensed behavioral health practitioner occur face-to-face, via telephone or via secure electronic means, unless clinically precluded as documented by the facility.

(AR 3.)[7]

---

5) There is clear clinical indication that if treatment services as currently provided in the plan of care were withdrawn, the patient's condition would deteriorate and likely require the patient to be moved to a more supervised level of care.

6) There is a recent history of multiple unsuccessful treatment attempts (inpatient stays, family therapy, outpatient treatment and other levels of care) within the last three months.

7) If request is for a child or adolescent: Parent or guardian voluntarily consents to treatment and is willing to actively participate in weekly family sessions/treatment unless clinically precluded as documented by the facility.

(AR 2.) According to the defendants, there is no dispute that the Admission Criteria were initially met, "so the admissions criteria are not implicated in this case." (Doc. No. 54, at 4 n.3.)

[7] The Continued Stay Review Criteria also had a "Service Intensity" component, an additional seven factors that were required to be met at each review in order for continued stay to be authorized. (AR 3.) The defendants assert that the Service Intensity criteria "are not at issue in this case, and were deemed met during the claim review process." (Doc. No. 54, at 4 n.3 (citing AR 294).)

Plaintiffs Hilary S. and Kevin D. resided in Davidson County, Tennessee at all relevant times. They are J.D.'s parents, having adopted him as an eight-week-old infant. (Doc. No. 2 ¶¶ 1, 9; AR 200.) Kevin D. was a Plan participant and J.D. was a Plan beneficiary. In 2016, when he was approximately fourteen years old, J.D. received treatment at Villa Santa Maria, a residential treatment center in New Mexico that provides sub-acute residential treatment to adolescents with mental health, behavioral, and/or substance abuse problems. (Doc. No. 2 ¶ 4; *see* AR 248–54 (Villa Santa Maria Master Treatment Plan).) BCBSSC, acting on behalf of Nelson Mullins and the Plan, approved admission and forty-three days of treatment at Villa Santa Maria, from April 19 through May 31, 2016. It denied claims for payment of J.D.'s medical expenses in connection with his stay at Villa Santa Maria for any time after May 31, 2016. (AR 64.) This lawsuit challenges the defendants' denial of the plaintiffs' claim for coverage of expenses incurred after May 31, 2016.

J.D. began exhibiting explosive temper tantrums when he was very young and was formally diagnosed with ADHD when he was four years old. He began receiving various mental health treatments at that time, which continued through adolescence, including medical and psychiatric intervention and psychological services, various types of outpatient therapy, multiple schooling interventions (and a full Individualized Educational Plan ("IEP") beginning in kindergarten), and several hospitalizations. (AR 82, 202, 251, 395, 510–71.) His behavior continued to become more extreme as he grew older. (AR 251.)

In August 2013, at age eleven, J.D. was hospitalized for ten days at Vanderbilt University Medical Center due to the intensity of his mental health symptoms. (AR 493.[8]) On April 1, 2014, he began participating in the "Trails" wilderness therapy program in North Carolina,[9] but, during

[8] The treatment records for that stay are not part of the Administrative Record.

[9] The Trails program is referenced in other records, but no records from Trails are part of the Administrative Record.

his time there, he had been "raging 2 hours at a time," throwing rocks and other objects, punching walls, and biting other children. (*Id.*) The Trails program reported that he had "shown some improvement, but is unable to maintain it." (*Id.*; *see also* May 2014 Psychological Evaluation, AR 510–36.) On May 15, 2014, he was admitted directly from the Trails program to the University of Utah Neuropsychiatric Institute ("UNI") Comprehensive Assessment and Treatment program. (AR 493, 499.) The reason for his admission was "'tantrums,' which have escalated into 'rages' for the past two years" (AR 493), and the purpose of admission was "for safety stabilization and ongoing diagnostic clarification" (AR 506). J.D. was noted upon admission to be at "moderate-to-high risk" for self-injurious behavior. (AR 494.) The estimated length of stay at admission was four to six weeks (AR 495), and the discharge summary indicates that he was at UNI until June 16, 2014. (AR 506.)

The "Recommendations" portion of the UNI Psychology Services Summary noted that the treatment team recommended

> further long-term treatment to address issues of mood instability, executive functioning problems associated with ADHD, anxiety, and communication problems . . . . However, due to the funds that such a placement would require, [J.D.'s] parents have been proactive in securing various outpatient services in their home community that would allow [J.D.] to be at home with his family. As such, it is recommended that a strong, predictable, structured schedule be implemented for [J.D.] within the home. . . . Along with individual and family therapy, future treatment should also incorporate consultation with a behaviorist to observe [J.D.'s] interactions with his parents and brother in the home [and] help [J.D.'s] parents to modify the behavioral plan as needed.

(AR 500; *see also* AR 507 ("The treatment team . . . were recommending residential placement for [J.D.] after he completed our program, but this was not financially feasible.").)

The Discharge Summary notes that J.D. had engaged in aggressive behavior and required "multiple locked seclusions" while hospitalized but that these incidents had decreased in "frequency and intensity over the course of his hospitalization." (AR 506.) At discharge, he was

considered to have "improved sufficiently to allow transition to [a] less restrictive level of care." (AR 508.)

The Administrative Record does not indicate significant problems following J.D.'s discharge from UNI in June 2014 through the summer of 2015. The record does not reflect whether he was home-schooled or attended public school in Nashville during the 2014–2015 academic year, but he apparently began the 2015–2016 year at public school in Nashville, based on the 2015–2016 IEP in the record. (AR 444–74.) This placement did not last, as J.D. transferred to the Academy at SOAR[10] sometime in the Fall of 2015. That school, too, "proved to be the wrong choice," as it did not offer a therapeutic setting and was deemed unsafe for J.D. and others. (AR 327.) The school recommended that J.D. be placed in a treatment setting that "include[d] focus on his Reactive Attachment Disorder and other diagnoses that are best treated in a therapeutic environment." (*Id.*)

After being asked to leave SOAR, J.D. was admitted to Second Nature in January 2016, a "licensed adolescent treatment program" in Georgia that provides a "wilderness setting with a clinically focused intervention." (AR 441.) The Second Nature Discharge Summary indicates that J.D. was there from January 30 through April 19, 2016. (*Id.*) Upon admission, J.D.'s parents "reported primary concerns regarding a significant history of defiance, anger, explosive tantrums, school failure, ADHD symptoms, social dysfunction and harmful peer relationships," as well as "considerable conflict with his parents, lying, alienation from peers, and emotional reactivity." (*Id.*) He was noted to have experienced "some success" and improvement in symptoms while at

---

[10] According to its website, SOAR is an "adventure-based private boarding school" in North Carolina for students in grades 7–12 with ADHD and learning disabilities that offers an "alternative learning environment that combines academics, adventure, and life skills development." https://soarnc.org/about-soar/ (accessed June 3, 2021).

Second Nature, but the discharging therapist expressed "concern[] regarding [J.D.'s] risk for relapsing if he were to return to his home environment after completing [the Second Nature] program." (AR 442.) She recommended that J.D. go directly from Second Nature to his next placement without returning home, as doing so would "place him at great risk for a regression in functioning and would undo much of the progress that he has made at Second Nature." (*Id.*)

CBA received a request from Villa Santa Maria for preauthorization of residential treatment services for J.D. on April 19, 2016. (AR 172–75.) Stephen E. Burgess, MSW, LISW-CP, the CBA behavioral health clinician assigned to manage the claim for J.D.'s residential treatment, concluded that the information provided met the Admission Criteria for residential treatment and approved such treatment for seven days for "evaluation." (AR 290.) The preauthorization for the initial seven days as "medically necessary" is memorialized in letters to J.D., Dr. Judith Pentz (J.D.'s treating psychiatrist), and Villa Santa Maria. (AR 5–8.)

J.D. was admitted to Villa Santa Maria on April 19, 2016. According to the Psychological Evaluation completed on May 4, 2016 by clinical psychologist Scott L. Blackwell, Ph.D., J.D. was admitted to Villa Santa Maria for "intensive attachment oriented residential treatment." (AR 388.) Upon admission, he was diagnosed with Disruptive Mood Dysregulation Disorder, ADHD, Anxiety Disorder, Developmental Coordination Disorder, Articulation Disorder, and Phonological Processing Disorder. (*Id.*) "Reactive Attachment Disorder was offered as provisional diagnosis." (*Id.*) According to Dr. Blackwell, J.D. presented a "very complex diagnostic picture," with multiple developmental delays and learning disabilities in addition to his psychiatric disorders. (AR 392, 393.) Dr. Blackwell recommended "[i]ntensive attachment oriented residential treatment," taking into consideration that J.D. had not benefitted from "less intensive outpatient interventions, medication trials, or brief therapeutic interventions outside the family." (AR 393.)

Upon admission, J.D.'s anticipated or estimated date of discharge was December 19, 2017. (AR 88, 254 (Villa Santa Maria Master Treatment Plan estimating length of stay to be "18–24 months").) The Master Treatment Plan summarized some of the behavioral problems that had led to his admission:

> Rages, Hitting Walls, Throwing stuff (rocks, chairs), Biting others (adults and peers), Lunges at others, Destroys his toys and other property destruction, Lying, Exaggeration, Extreme defiance, Tantrums, Poor impulse control, Self-injurious behavior (head banging, bites self), Aggressive language, Poor hygiene (needs lots of cuing to get things done), Cruelty to animals (has kicked the family dog out of anger, more impulsive), Need for restraints (four hours at one point recently at other center), Requires lengthy transition period, Aggressive Fidgeting, Leaving designated area (not running away, more wandering off), Highly impulsive, Blurts out noises and comments, Overresponsive to noises (both inside and outside of classroom) . . . .

(AR 251.) While at Villa Santa Maria, J.D. participated in individual, group, and family therapy sessions and regular psychiatric evaluations. (AR 254, 328–45, 397–434; 346–60.) According to J.D.'s treatment record and his family, J.D. continued to exhibit aggression at Villa Santa Maria, regularly resulting in therapeutic holds, or restraints.[11] (*See, e.g.*, AR 80, 351, 354, 358.)

Dr. Pentz's treatment notes for May 4, 2016 indicate that school frequently triggered "anger issues" and that therapeutic holds were "very intense and long." (AR 257.) By the end of May, she noted that J.D. continued to have "challenges" with anger and impulse control, ending up in holds, and she discussed a change in medications with his parents. (AR 258–59.) On June 1, she noted that staff had indicated holds were not as intense since J.D.'s medications had been adjusted. (AR

---

[11] The parties do not define this term, but the court understands that therapeutic "holding" (or "holds") is a treatment technique in which a violent patient, typically a child or adolescent, is physically contained by an adult, rather than by mechanical or chemical restraints or seclusion, for safety reasons. *See* https://www.jointcommission.org/standards/standard-faqs/behavioral-health/care-treatment-and-services-cts/000002269/; *see also* https://www.aacap.org/AACAP/Member_Resources/Practice_Information/SR_Articles/Is_Therapeutic_Holding_Dead.aspx (accessed June 22, 2021).

261.) Through the same time frame, J.D.'s therapist, Aaron Bowers, working with J.D. and his parents in individual and family therapy sessions, noted that J.D. was working toward developing trust in adults and himself (*see, e.g.*, AR 414) and the ability to express his emotions (AR 431), but J.D. continued to struggle with the need for restraints and required a high level of support for safety (AR 406, 404, 433, 430).

Throughout the summer, J.D. continued to work with Pentz and Bowers for individual and family therapy sessions. He continued to have difficulties with trusting adults and with self-regulation, but, by August 19, 2016, they were looking at "future plans" and how to prepare for discharge. (AR 322.) A treatment note for August 22, 2016 indicates that J.D. was starting to "express himself more verbally and is getting to a point where [he] is not as aggressive." (AR 330.) Toward the end of September he had a good visit with his mom, during which they were able to go shopping at Walgreen's and eat out at a sushi restaurant. (AR 358.)

As reflected in CBA's review of the same treatment records for the period of time from admission through May 31, 2016, J.D.'s progress was slow. On April 26, 2016, Stephen Burgess noted that J.D. was struggling to adjust to the treatment center, particularly the school component, and restraints were used on April 22 and 24. (AR 292–93.) J.D. was observed to present with more of an attachment disorder (Reactive Attachment Disorder or "RAD") than Autism Spectrum Disorder but, as Burgess noted, psychological testing was to take place within a week. (AR 293.) Burgess approved an additional seven days, through May 2, but noted that he would likely seek physician review if the clinical observations of J.D. were similar after an additional seven days. (AR 294.) The preauthorization based on medical necessity is memorialized in letters to J.D., Pentz, and Villa Santa Maria. (AR 10–13.)

On May 5, 2016, Burgess again approved an additional six days of treatment, through May

8. (AR 298.) His review of the record noted that J.D. was physically "lash[ing] out" at times and required restraints "every other day." (AR 297.) Villa Santa Maria staff reported limiting J.D.'s socialization with peers outside of treatment due to his "history of physical altercations." (*Id.*) The facility also indicated that it was trying to determine J.D.'s behavioral "baseline." (*Id.*) While Burgess approved the additional six days, he expressed skepticism as to whether the treatment met Criterion 4 of the Continued Stay Review Criteria (AR 298), that is, whether there was "a reasonable expectation of further improvement in the targeted acute behavioral health symptom(s) with continued treatment at this level of care that only this level of care can provide." (AR 3.) Specifically, Burgess noted that the many of the behaviors J.D. exhibited "appear to have been present for several years prior to admission." (AR 298.) Burgess noted that he would obtain a physician review at the next review date. (AR 299.) The authorization for continued residential treatment through May 8 is memorialized in letters to J.D., Pentz, and Villa Santa Maria. (AR 15–18.)

On May 9, 2016, CBA psychiatrist April Richardson reviewed J.D.'s clinical file, noting that he continued to display "aggression resulting in restraint" and that this "appear[ed] to be a long-standing symptom[]." (AR 303.) She also observed that no outings were being conducted and that there was no mention in the record of upcoming planned outings. Richardson "question[ed] reasonable expectation for improvement in this LOC [level of care] given the current treatment plan." (*Id.*) She nonetheless approved an additional four days, pending the results of psychological testing and to allow time for "transition to a LLOC [lower level of care]." (*Id.*) She opined that Criteria 3[12] and 4 of the Continued Stay Review Criteria were "likely not met." (*Id.*) This approval

---

[12] Criterion 3 is: "Treatment plan and documentation reflect opportunities for the patient to practice skills gained in residential treatment setting. There is evidence of documented weekly

of continued treatment through May 12 as "medically necessary" is memorialized in letters to J.D.,

Pentz, and Villa Santa Maria. (AR 20–23.)

Dr. Richardson again reviewed J.D.'s clinical file on May 13, 2016 and observed that there

had been "very limited progress in the month since admission." (AR 308.) The psychological test

results were still not available, but Richardson did not believe that a patient with Disruptive

Behavior Disorder and possible Reactive Attachment Disorder could be expected to improve in

the residential treatment center setting. (*Id.*) She opined that J.D.

> would benefit from out[patient] services to address family work in his home
> environment as well as individual therapy. Outings have not been initiated and this
> is the first time the [patient] has seen his parent in several months, and I don't know
> how the facility would be working on improvement in symptoms for his [diagnoses]
> without intensive family work. At this time, there is not reasonable expectation for
> improvement and the facility is not meeting criteria for continued treatment as no
> active management is being done . . . . Criteria 2–5 are not met.[13]

(*Id.*)

Based on this assessment, Richardson initially denied authorization for further treatment at

Villa Santa Maria. (*Id.*) The denial was memorialized in May 13, 2016 letters to J.D., Villa Santa

Maria, and Pentz. (AR 57–63.) The letters stated that further treatment was denied, because "[t]he

clinical information did not document acute behavior health symptoms that required the requested

level of care." (AR 57.) Without expressly stating that the requested care was not deemed

---

outings and family/therapeutic passes of increasing frequency and intensity, unless clinically
precluded as documented by the facility." (AR 3))

[13] Criteria 2 and 5 are:

2) There is compliance with all aspects of the treatment plan, unless clinically precluded
as documented by the facility. . . .

5) If treatment progress is not evident, then there is documentation of treatment plan
revisions to address lack of progress and there is fair likelihood that the patient will
demonstrate progress with these changes.

medically necessary, the letter explained that the Plan "requires services to be medically necessary for benefit coverage" and that "medically necessary services" are those "that a physician, hospital or other covered professional or facility provides for the purpose of preventing, evaluation, diagnosing or treating an illness, disease, or its symptoms." (*Id.*) The denial letter noted that CBA "determine[s] medical necessity by evaluating clinical data from the provider against CBA's utilization management criteria or Protocol which is developed, reviewed and approved by a panel of behavioral health professionals." (*Id.*)

Dr. Richardson (and therefore CBA) reversed course three days later and approved an additional fourteen days of treatment at Villa Santa Maria, after Richardson participated in a peer-to-peer consultation with Pentz on May 16, 2016. Based on that conversation, as reflected in the record, Richardson understood that J.D. was still requiring one-to-one supervision at the facility but had experienced some improvement in his symptoms, insofar as he was "able to identify more what his triggers are," although he still needed "restraints or brief holds 3–4 days per week." (AR 308–09.) In addition, J.D.'s mother had been on-site for intensive face-to-face family therapy with J.D. at the facility, participating in seven hours of "therapy/education the first day" and an additional four to five hours the second day. (AR 309.) The facility was working with the parents to "retrain" them on "how to interact with [J.D.] and no[t] reinforce negative behaviors." (*Id.*) Richardson determined, again based on her conversation with J.D.'s treating providers, that, if J.D. were discharged from Villa Santa Maria at that time, he would be at "high risk for decompensation at a LLOC and would likely rehospitalize." (*Id.*) She ultimately concluded that,

> [w]hile he has difficult diagnoses, it appears that the facility is making some progress and working closely with the family to address the symptoms and behaviors present. Will approve 14 days. Criteria met, although 4 is questionable. The risk of needing a higher LOC outweighs the possible risk of not making significant progress in the next few days.

(*Id.*) Approval for continued residential treatment through May 26, 2016 as "medically necessary"

was memorialized in letters to J.D., Pentz, and Villa Santa Maria dated May 16. (AR 25–28.)

On May 27, at the next stay review, Burgess noted that the "[c]linical information provided remains quite similar at each review." (AR 314.) He continued to question whether treatment at the residential center might "exacerbate" some of J.D.'s behavioral issues and whether he would not be "better served with clinical services closer to home, as well as services within the home." (*Id.*) He expressed particular concern that, due to the distance of their home from the facility, the parents' participation in family sessions was primarily by Skype and telephone and that J.D. had not had any outings since admission. Burgess also found the discharge date eighteen months in the future to be "unrealistic." (*Id.*) Burgess forwarded the file for review by a physician.

Later the same day, Dr. Zach Stroud, another CBA reviewing psychiatrist, essentially concurred with Burgess and entered the following note:

> The PT [patient] continues to require restraints 3 times a week and is continuing with his biting behaviors. The PT is having family sessions electronically but there have been no outings. Evidence supports intensive outpatient treatment with intensive family therapy as treatment of choice for disruptive behavior symptoms and it is unclear how the PT will improve with such limited interaction outside of the facility. It also appears that the treatment is somewhat programmatic as his projected discharge date is set 6 months away [sic]. There has [sic] been insignificant changes to his medication since the last review. Due to the continued requirement of restraints, I would approve 5 more days. It appears that ultimately Criteria 4 will be the central issue leading to continued approval of days as the PT suffers from chronic and pervasive illnesses that are unlikely amenable to [residential treatment center] treatment. Criteria 1, 2, 4–7 are met with 4 and 5 being questionable.

(AR 314–15.) The approval of five additional days of residential treatment, through May 31, 2016, was memorialized in May 27, 2016 letters to J.D., Pentz, and Villa Santa Maria. (AR 30–34, 38.)

CBA denied the request for coverage of additional treatment at Villa Santa Maria after May 31, 2016. Stephen Burgess initially concluded, in his June 1, 2016 review, that Criteria 2, 5, and 7

were met but 1,[14] 3, 4, and 6 were not. Regarding Criterion 3, Burgess noted that J.D. had attended

some "outings" and had done "okay" with them, but no outings with J.D.'s parents had taken place.

(AR 155.) Regarding Criterion 4, Burgess "continue[d] to question" whether care at a residential

treatment center was appropriate for J.D., as his conditions appeared to be chronic and, therefore,

"likely better served" at a lower level of care in conjunction with "intensive 'in home services.'"

(*Id.*) He believed Criterion 6 (requiring documentation of "[a]ctive discharge planning") was not

met, because a projected discharge date of December 2017 was too far in the future to indicate that

"active discharge planning" was occurring. (*Id.*)

Burgess forwarded the case for physician review, and Dr. Richardson reviewed the file the

same day. She concurred in the recommendation that continued coverage should be denied. She

concluded that,

> [d]ue to his family conflicts and poss[ible] RAD diagnosis[,] [J.D.] would benefit
> from intensive in-home services and family work. There does not appear to be the
> intensity of family work present that was presented on the peer to peer call in May.
> No updates on the intensive with mom and no info on recent sessions with family.
> I would not expect significant improvement in this LOC given the prescribed time
> frame noted (what are the active treatment plan goals) and the lack o[f] intensive
> family work to address RAD and disruptive behaviors. I would deny benefit due to
> lack of progress, no outings with family or treatment plan changes to address
> current symptoms this [patient] has. I would deny benefits. Criteria 2, 3, 4, 5 are
> not met.

(AR 157–58.)

Richardson attempted to call Pentz the next day, on Thursday, June 2, 2016, for a follow-

up peer-to-peer discussion. The therapist with whom she spoke informed her that Pentz would not

be available until Monday, June 6. (AR 159.) Because a psychiatrist was not available for a peer-

---

[14] Criterion 1 is "The patient's condition continues to meet admission criteria and this level
of care remains necessary to treat the intensity, frequency and duration of current behaviors and
symptoms." (AR 3.)

to-peer discussion "within the timeframe" expected, Richardson informed the therapist that they could request an "EA"—presumably an expedited appeal. (AR 160, 574.) Richardson upheld the denial of further coverage for residential treatment. (AR 160.)

On Friday, June 3, 2016, Dr. Daniel Harrop reconfirmed the denial of residential-level treatment on expedited appeal. He found that:

> Medical necessity criteria guidelines for residential treatment ha[ve] not been met. The member did not show evidence of requiring 24 hour per day, 7 day per week supervision, intervention, and treatment in a therapeutic facility for mental health or substance abuse needs. The member did not have any reported medical or psychiatric conditions that would have rendered unsafe treatment on an outpatient basis. There was no reported information that the member's home or social support environment would not have supported outpatient treatment. There was not evidence that member would have been at risk to self or others if the member were not in a residential treatment program. The member was adequately able to care for physical needs. There was no indication that the member could not have been treated effectively in a less restrictive level of care.

(AR 166–67.)

The plaintiffs, Pentz, and Villa Santa Maria were notified of the denial of coverage for further residential treatment at Villa Santa Maria by letters dated June 1, 2016. (AR 64–70.) CBA justified the denial on the basis that "[t]he clinical information did not document acute behavioral symptoms that required the requested level of care." (AR 64.)

On September 28, 2016, Kevin D. submitted a letter appealing the denial of coverage for residential treatment at Villa Santa Maria after May 31, 2016, arguing that the treatment was medically necessary. (AR 325–26.) Included with Kevin's letter were a copy of a large part of J.D.'s school, medical, and treatment records from Villa Santa Maria and elsewhere (AR 328–434, 441–571) and several "medical necessity letters," including a letter from Dr. Pentz dated August 31, 2016 (AR 435–38).

In her letter, Pentz averred that, prior to entering Villa Santa Maria, J.D. had not responded well to lower levels of treatment and that, since admission, his providers had "continued to see

many alarming behaviors that continue to warrant 24 hour supervision and structure." (AR 435–36.) At the same time, Pentz noted that J.D. was "responding well on several levels to this type of treatment and the interventions we offer, and . . . making progress commensurate with his length of stay so far." (AR 436.) She recommended as follows:

> [I]t is our clinical judgment that [J.D.] continues to need this level of care in order to be safe and that he continues to meet Medical Necessity given his potential for regression along with the severe trauma that comes with multiple transitions.
>
> If [J.D.] is prematurely discharged it is highly likely that another transition could be the one that creates a deeper disconnect that could ultimately impair his mental health to the point that he may give up and not be open to further treatment. He currently requires a high level of supervision and structure, along with one-on-one supervision throughout parts of his day to help him not get into dangerous situations, make unsafe choices or be aggressive toward others.
>
> Sufficient stabilization has not occurred that will allow for a successful discharge home. [J.D.] has been partially stabilized, but clearly requires more time before it will be sufficient to discharge home. [J.D.] is currently active in participating in treatment and we are discussing discharge planning with him to a degree that is appropriate for his condition.

(AR 437.)

Kevin D. also included a letter from Brenda Loringer, educational and therapeutic consultant. Her letter stated, in relevant part:

> I am the educational and therapeutic consultant that has been working with the [D. family] over the past several years. [J.D.]'s needs are very specific to his diagnostic and behavioral picture. Long-term, residential level of care has been recommended by every evaluative provider that has worked with him over the years. He requires a specific approach that can safely contain him physically and emotionally, develop a trusting relationship and help him develop new, better coping skills. The long history of failed attempts at achieving this in the home environment or alternative settings is well documented. [J.D.] needs to be in a facility that can handle his level of emotional deregulation[15] and aggressive behaviors in a non punitive way.

(AR 439.)

Registered Nurse Roni Keretses initially reviewed the appeal, referencing information in

---

[15] The correct word here would likely be "dysregulation."

the record up through June 1 but none of the materials submitted after the denial of benefits. (AR 573.) She concluded that "clinical information does not appear to meet" CBA's Continued Stay Criteria 1 through 5 and forwarded the case to Dr. Brian Still for further review. (*Id.*) Dr. Still concurred in the denial of benefits. Still averred that he had "a scope of licensure or certification that typically manages the medical condition . . . or issue under review" and had "current, relevant experience and/or knowledge to render a determination" in the case. (AR 323.) He indicated that the review was based on "all of the appeal documents," "including but not limited to the appeal letter [and] various medical records." (*Id.*) He identified J.D.'s diagnoses, recognized that he presented with "a long complicated psychiatric history," and noted that he had been approved for forty-three days of residential treatment prior to Still's review. (*Id.*) Still found as follows:

> According to the clinical information available there were no reports of any acute psychiatric symptoms that would have continued to require this 24 hour level of care. Specifically, there was no report of suicidal behavior, suicidal intent, mania, psychosis or depression to such an extent to suggest that this patient was an [sic] acute danger if he were outside of a 24 hour level of care environment. Of note, this patient continued to display oppositional behaviors which were chronic in nature. However, after the last fully covered day there was no evidence that a realistic expectation of improvement remained from the treatment being provided. While this patient's chronic behavioral symptoms continued, it appeared this patient needed behavior-based therapy that would be most appropriately conducted on an outpatient basis with aggressive family involvement. Accordingly, given the distance of this patient's residential treatment from home most of the family therapy had been taking place on an electronic basis and did not involve regular reassessment of actual dysfunctional relationship patterns from a face to face interaction amoung [sic] family members. While it is reasonable for electronic media to be used in fostering treatment and relationships, it does not seem reasonable to continue to expect this to function as the main medium of family based care in this complicated patient from which [sic] family based therapy likely represents one of the most important parts of this patient's treatment. . . .

(*Id.*) He concluded, from a review of these factors, that "continued residential treatment would not be expected to produce realistic improvement in this patient's treatment and a lower level of care would actually be more advantageous for this patient [sic] long term progress." (AR 324.) He, therefore, concurred in the denial of treatment at Villa Santa Maria beyond the initial forty-three

days.

On December 7, 2016, CBA issued the Plan's final determination on the appeal, upholding the denial of coverage for residential treatment after May 31, 2016. (AR 608.) The denial letter stated:

> The psychiatrist reviewing this case has decided to uphold the decision to deny benefits for the date(s) under appeal because the clinical information provided by the facility did not meet CBA's utilization management criteria for the requested service. By 6/1/16, the clinical information did not document that this level of care remained necessary to treat the intensity, frequency and duration of behaviors and symptoms. According to the clinical information available there were no reports of any acute psychiatric symptoms that would have continued to require this 24 hour level of care. Specifically, there was no report of suicidal behavior, suicidal intent, mania, psychosis or depression to such an extent to suggest that this patient was an [sic] acute danger if he were outside of a 24 hour level of care environment. Of note, this patient continued to display oppositional behaviors which were chronic in nature. However, after the last fully covered day there was no evidence that a realistic expectation of improvement remained from the treatment being provided. While this patient's chronic behavioral symptoms continued, it appeared this patient needed behavior-based therapy that would be most appropriately conducted on an outpatient basis with aggressive family involvement.

(*Id.*) The denial letter also reiterated that services had to be medically necessary to be covered, explained the right to request external review, and provided the paperwork for making such a request. (AR 609–19.)

On December 16, 2016, Hilary S. submitted a request for external review of the denial of coverage for residential treatment after May 31, 2016. (AR 79.) In a letter attached to the request, Hilary S. argued that J.D.'s treatment at Villa Santa Maria (where he had remained despite the denial of coverage) remained medically necessary in light of his continued need for therapeutic holds, without which J.D. and others could be in acute danger "if he were outside of a 24 hour level of care environment." (AR 80–81.) Hilary S. also explained that J.D. exhibited RAD symptoms and that Villa Santa Maria was one of only two programs in the country specializing in the treatment of adolescents with that particular disorder. The other program, located in Missouri,

was significantly more expensive than Villa Santa Maria. Hilary D. also pointed out that the round-the-clock in-home staffing that would be required if J.D. were discharged prematurely would also be more expensive over time than treatment at Villa Santa Maria. (AR 80.)

On February 15, 2017, Dane Street, LLC, an Independent Review Organization, upheld the denial.[16] (AR 645.) The report by reviewer Ragy Girgis, M.D. identified the medical records received in conjunction with the requested review, which included all of those sent by the plaintiffs, including Dr. Pentz's August 31, 2016 letter. (AR 646.) Dr. Girgis acknowledged Dr. Pentz's opinion that J.D. continued to exhibit alarming behaviors that warranted "24-hour supervision and structure." (AR 647.) Girgis noted Pentz's evaluation that J.D. had made progress and responded well to treatment and that such progress was "commensurate with the length of stay." (*Id.*) He also acknowledged Hilary S.'s letter stating that, as of December 2016, J.D. still needed a twenty-four-hour level of care and therapeutic holds, "which if not administered could result in acute danger to the patient and others." (*Id.*) Dr. Girgis nonetheless concluded that "[t]he medical records do not indicate that the patient would further benefit from residential treatment center level of care" and that "[a] more chronic setting is appropriate for this member." (*Id.*)

Kevin D. and Hilary S. aver that the denial of their claim for benefits caused them to incur medical expenses in excess of $137,000 that should have been paid by the Plan and BCBSSC. (Doc. No. 2 ¶ 35.)

---

[16] The record before the court does not contain any information regarding how an independent review organization is selected or who pays for its services. The Plan states only that, after a member has completed the process of appealing an "adverse benefit determination," the member will be "entitled to an additional review of the Member's claim at no cost to the Member" if a claim has been denied for failure to meet medical necessity requirements. (AR 851.) The member is required to request an external review within four months of receiving notice of the final adverse decision, following which the Claims Administrator has five days to "assign[] the Member's request for an external review to an independent review organization and forward[] the Member's records to such organization." (*Id.*)

## II.   FIRST CAUSE OF ACTION: RECOVERY OF BENEFITS UNDER 29 U.S.C. § 1132(a)(1)(B)

### A.   The Applicable Standard of Review

The plaintiffs, for their "First Cause of Action," seek recovery of benefits under 29 U.S.C.

§ 1132(a)(1)(B), which states that a plan participant or beneficiary may bring a civil cause of action

"to recover benefits due to him under the terms of his plan, to enforce his rights under the terms

of the plan, or to clarify his rights under the terms of the plan." Judicial review of the denial of

benefits under § 1132(a)(1)(B) is *de novo* unless the ERISA plan at issue gives the administrator

"discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the language of the plan grants

the plan administrator discretionary authority to determine eligibility for benefits or to construe

plan terms, then the determination is reviewed under the extremely deferential "arbitrary and

capricious" standard. *Id.*; *Frazier v. Life Ins. Co. of N. Am.*, 725 F.3d 560, 566 (6th Cir. 2013). For

the arbitrary and capricious standard to apply, "the plan must contain 'a *clear* grant of discretion

[to the administrator] to determine benefits or interpret the plan.'" *Perez v. Aetna Life Ins. Co.*,

150 F.3d 550, 555 (6th Cir. 1998) (en banc) (quoting *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368,

1373 (6th Cir. 1994)) (emphasis in original).

### 1.   *Whether the Plan Grants Discretion*

There is no dispute in this case that the Summary Plan Description ("SPD")[17] provided to

the plaintiffs clearly describes the Plan as granting discretion to the administrator to determine

benefits or construe the Plan. (*See* AR 712 ("To the fullest extent permitted by law, the plan

---

[17] ERISA requires covered welfare benefit plans to furnish to participants and beneficiaries a written "summary plan description" that explains the terms of the plan "in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a).

administrator will have the exclusive discretionary authority to determine all matters relating to the plan, including eligibility, coverage and benefits. The plan administrator will also have the exclusive discretionary authority to determine all matters relating to interpretation and operation of the plan.").)

The language of the SPD is not dispositive, however. The Supreme Court has held that statements in summary plan documents, "important as they are, . . . do not themselves constitute the terms of the plan for purposes of § [1132](a)(1)(B)." *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011); *Frazier*, 725 F.3d at 566–67. Rather, determining the standard of review "requires an examination of the plan documents" to determine whether the plan itself grants discretionary authority to the plan administrator. *Lee v. MBNA Long Term Disability & Benefit Plan*, 136 F. App'x 734, 743 (6th Cir. 2005).

The plaintiffs argue that the SPD's language is not controlling here, because it "goes beyond the terms of the controlling plan documents." (Doc. No. 63, at 1.) The defendants contend that the SPD is consistent with the Plan itself, which also grants discretion to the plan administrator to determine coverage and benefits. The defendants point to language in the Plan that authorizes the Plan to "pay all Covered Expenses directly to the Member upon receipt of *due proof of loss* when a Non-Participating Provider renders services." (AR 863 (emphasis added).) The Sixth Circuit has found "due proof," "satisfactory proof," and similar phrases sufficiently clear to grant discretion to administrators and fiduciaries. *See, e.g.*, *Fendler v. CNA Grp. Life Assur. Co.*, 247 F. App'x 754, 755 (6th Cir. 2007) (finding "due proof" language sufficient to grant discretionary authority); *Leeal v. Cont'l Cas. Co.*, 17 F. App'x 341, 343 (6th Cir. 2001) (same); *Frazier*, 725 F.3d at 567 (finding "satisfactory proof" language sufficient to grant discretion to plan administrator); *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (en banc) (same);

*Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991) (same).

The Plan in this case, as in *Frazier*, "could have more clearly expressed this grant of discretion," but the "'mere fact that language could have been clearer does not necessarily mean that it is not clear enough.'" *Frazier*, 725 F.3d at 567 (quoting *Perez*, 150 F.3d at 558). This court is bound by Sixth Circuit precedent to conclude that the language of the Plan grants discretion to the plan administrator. The plaintiffs effectively concede that "Sixth Circuit precedent allows for this conclusion," but they assert that the Sixth Circuit "needs to revisit this question" to bring it in line with other jurisdictions that have held that "the mere requirement to submit 'satisfactory proof' does not confer discretion upon an administrator, and thus, does not insulate the administrator from *de novo* review."[18] (Doc. No. 59, at 4, 5.) Regardless of other appellate courts' resolution of this question, this court is not at liberty to deviate from binding Sixth Circuit precedent that calls for deferential review in this case.

### 2. Whether the Defendants Provided a Full and Fair Review

Anticipating that outcome, the plaintiffs raise an additional argument in support of application of a *de novo* review standard. They insist that the court should apply a *de novo* standard, because the defendants, by "failing to follow the applicable claims procedure regulations, 29 C.F.R. §2560.503-1 and 29 C.F.R. 2590.715-2719, . . . failed to provide the full and fair review ERISA requires and forfeit[ed] any right to a deferential standard of review." (Doc. No. 59, at 6.) In support of this position, the plaintiffs argue that (1) "courts are required to give less deference

---

[18] The Second, Third, Seventh, and Ninth Circuits have apparently reached this conclusion. *See Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 414 (3d Cir. 2011) ("Most courts of appeals to consider the issue have concluded that the mere requirement to submit 'satisfactory proof' does not confer discretion upon an administrator, and thus, does not insulate the administrator from *de novo* review." (citing *Perugini–Christen v. Homestead Mortg. Co.*, 287 F.3d 624, 626–27 (7th Cir. 2002); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 251 (2d Cir. 1999); *Kearney v. Std. Ins. Co.*, 175 F.3d 1084, 1089–90 (9th Cir. 1999) (en banc)).

to paper reviewers than to the recommendations of treating providers" (*id.*), and the defendants'
failure to obtain a second "peer-to-peer" review demonstrates that they did not adequately consider
the opinion of the treating physician (*id.* at 8);[19] and (2) the plan administrator "engaged in
procedural irregularities while determining benefits" that were not inadvertent, minor, or harmless,
specifically by limiting the review on appeal to clinical information that had been provided as of
June 1, 2016 and ignoring documentation of J.D.'s treatment after that date (*id.* at 9).

### a) *Deference to Treating Providers*

"Under ERISA, plan administrators are not required to accord special deference to the
opinions of treating physicians." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504
(6th Cir. 2010) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003)). "ERISA
does not impose a heightened burden of explanation on administrators when they reject a treating
physician's opinion." *Id.* Plan administrators may rely on non-treating physicians, but they may
not "totally ignore the treating physician's opinions." *Id.* In addition, the Sixth Circuit has
recognized that "[w]hether a doctor has physically examined the claimant is . . . one factor that we
may consider in determining whether a plan administrator acted arbitrarily and capriciously in
giving greater weight to the opinion of its consulting physician. But reliance on a file review does
not, standing alone, require the conclusion that [a plan administrator] acted improperly." *Kalish v.
Liberty Mut./Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 508 (6th Cir. 2005) (internal
quotation marks and citation omitted).

In other words, the reliance on "paper reviewers" is not necessarily inappropriate and does

---

[19] In their own Motion for Summary Judgment, the plaintiffs argue only that these two
factors (the defendants' failure to personally examine J.D. and the fact that the doctors on whose
opinions the defendants relied were employed by the plan administrator) factor into the
determination of whether a decision was arbitrary and capricious. (Doc. No. 49, at 14–15.)

not change the arbitrary and capricious standard of review, but it is a factor to be considered in conducting that review. Likewise, the plaintiffs' complaint that the defendants failed to conduct a second peer-to-peer discussion before deciding to deny further treatment at SMV does not alter the applicable standard of review. It is simply another factor to be considered in the court's review of the denial of benefits.

b) *Procedural Irregularities*

The Sixth Circuit recognizes that 29 C.F.R. § 2560.503–1 "outlines the essential procedural requirements for a full and fair review" of an administrative appeal of the denial of benefits. *Balmert*, 601 F.3d at 502. These include:

> (1) the allowance of [at least] 60 days, after notification of an adverse benefit determination, in which a claimant may file an administrative appeal; (2) the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits; (3) the right to be provided, upon request and free of charge, reasonable access to and copies of all documents, records, and other information relevant to the claim for benefits; and (4) the requirement that the fiduciary take into account all comments, documents, records, and other information submitted by the claimant relating to the claim, regardless of whether such information was submitted or considered in the initial benefit determination.

*Id.* (citing 29 C.F.R. § 2560.503–1(h)(2)).

The last of these is at issue here—whether "other information submitted" by the plaintiffs was "take[n] into account." The plaintiffs argue that it was not, pointing to the December 7, 2016 letter from CBA upholding the denial of continued treatment after May 31, 2016. (AR 608.) The portion of the letter quoted by the plaintiffs states:

> The psychiatrist reviewing this case has decided to uphold the decision to deny benefits for the date(s) under appeal because the clinical information provided by the facility did not meet CBA's utilization management criteria for the requested service. By 6/1/16, the clinical information did not document that this level of care remained necessary to treat the intensity, frequency and duration of behaviors and symptoms. According to the clinical information available there were no reports of any acute psychiatric symptoms that would have continued to require this 24 hour level of care. Specifically, there was no report of suicidal behavior, suicidal intent,

mania, psychosis or depression to such an extent to suggest that this patient was an acute danger if he were outside of a 24 hour level of care environment. Of note, this patient continued to display oppositional behaviors which were chronic in nature. However, after the last fully covered day there was no evidence that a realistic expectation of improvement remained from the treatment being provided.

(Doc. No. 59, at 9–10 (quoting AR 608) (emphasis added).) The plaintiffs characterize this letter as establishing that the defendants, in the appeals process, limited their review "to the clinical information that had been provided as of June 1, 2016." (*Id.* at 10.) The plaintiffs assert that they provided additional documentation from treating providers after June 1, 2016 (*id.* (citing AR 325–572, 435–38, 439)) but that the final denial letter "gives no reason to think that the Defendants gave consideration to the documents [the plaintiffs] provided showing that [J.D.'s] treatment after June 1, 2016, was medically necessary." (*Id.*)

It is clear, however, that the documentation of the treatment J.D. received after May 31, 2016 that the plaintiffs claim was ignored is part of the stipulated administrative record. (*See, e.g.*, AR 325–84, 416–28, 435–40.) Dr. Brian Still, in conducting the appeal review, expressly stated that he had taken into consideration "all of the appeal documents," "including but not limited to the appeal letter [and] various medical records." (AR 323.) Still's reference to "all of the appeal documents" and to the continuation of J.D.'s "chronic behavioral symptoms" after "the last fully covered day" (*id.*) supports a conclusion that Still, unlike Nurse Keretses, actually reviewed the record evidence compiled by the plaintiffs following the denial of continued coverage. (*Id.*) The letter quoted by the plaintiffs essentially paraphrases Still's review and states, in its first paragraph, that a "board certified psychiatrist not involved with the original denial decision [has] reviewed the available clinical information *and/or other information provided regarding this appeal*." (AR 608 (emphasis added).) Finally, and probably most importantly, the plaintiffs sought a further review, in accordance with the prescribed procedure, which involved a review by Dane Street, LLC, an Independent Review Organization. (*See* AR 645.) The itemized list of documents

included in Dane Street's review included the documentation submitted by the plaintiffs after June 1, 2016, and the summary of evidence provided by Dane Street also incorporated reference to Dr. Pentz's letter dated August 31, 2016 and the plaintiff's mother's appeal letter dated December 16, 2016. (AR 646–47.) In addition, the specific question addressed by Dane Street was whether, "[b]ased on the documentation available," "the member require[d] residential treatment center level of care after 5/31/2016 or could the services be safely and effectively performed in a less comprehensive setting?" (AR 647.)[20]

In the absence of evidence that the additional documentation was not considered by the decisionmakers on the final appeal, the degree to which the final decision conflicts with documentation submitted by the plaintiffs after the initial decision is yet another factor that may be taken into consideration in determining whether the final decision was arbitrary and capricious, but it does not call for a more deferential standard of review.

### 3. The "Arbitrary and Capricious" Standard

The arbitrary and capricious standard of review is "the least demanding form of judicial review of administrative action." *Johnston v. Dow Employees' Pension Plan*, 703 F. App'x 397, 401 (6th Cir. 2017) (quoting *Farhner v. United Transp. Union Discipline Income Prot. Program*,

---

[20] As the plaintiffs point out, Dane Street's ambiguous response to this disjunctive question was "Yes." (AR 947.) However, the second question it identified as within the scope of its review was: "If care after 5/31/2016 was appropriate for a residential treatment center level, when was the member appropriate to transition to a less comprehensive level of care?" (*Id.*) The answer to this question was "N/A" (*id.*), indicating that the "yes" in answer to the first question was intended to respond to the second half of the question only—meaning that the identified services *could* be "safely and effectively provided in a less comprehensive setting." (*Id.*) The report's "Rationale" further explaining the answers to the questions confirms that interpretation. (*See id.* ("The medical records do not indicate that the patient would further benefit from residential treatment center level of care. A more chronic setting is appropriate for this member. Therefore, based on the documentation available, the member did not require residential treatment center level of care after 5/31/2016.").)

645 F.3d 338, 342 (6th Cir. 2011)). While this standard is "not without some teeth, 'it is not all teeth.'" *Id.* (quoting *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014)). As the Sixth Circuit has repeatedly recognized, the level of deference accorded by the standard is "extreme": "Indeed, for '[a]n extremely deferential review[] to be true to its purpose, [it] must actually honor an extreme level of deference to the administrative decision.'" *Id.* (quoting *McClain*, 740 F.3d at 1064–65). Under this standard, the challenged denial of benefits "must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Id.* That is, a decision cannot be deemed arbitrary or capricious if it is "'rational in light of the plan's provisions,' or when it is possible to 'offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Id.* (quoting *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)).

### B.     The Burden of Proof

In their motion, besides disputing the degree of deference to be afforded the decision to deny benefits, the plaintiffs argue that they can "meet their burden" of showing that J.D.'s continued treatment at Villa Santa Maria was medically necessary. (Doc. No. 49, at 15 (citing *Rose v. Hartford Fin. Servs. Grp.*, 268 F. App'x 444, 452 (6th Cir. 2008)).) In *Rose*, an ERISA case involving the termination of long-term disability benefits, the court recognized that the plaintiff carried the burden of "presenting evidence showing that she was disabled from performing any occupation for which she was reasonably qualified by education, training, or experience." *Rose*, 268 F. App'x at 452. In the context of the denial of coverage for medical benefits, however, the plaintiffs do not bear the burden of simply presenting evidence that the requested benefits were medically necessary. Rather, they "bear[] the burden of proving that the Plan Administrator's decision [denying benefits] was arbitrary or capricious." *Farhner*, 645 F.3d at 343.

Along the same lines, the plaintiffs assert that "[t]he only dispute is whether [J.D.'s]

continued care satisfied the Plan's definition of medical necessity as defined by the Plan" and that, because the defendants "relied on an exclusion to coverage under the policy, they carry the burden of proving that the exclusion applied." (Doc. No. 49, at 16.) Again, the plaintiffs are mistaken. First, the question the court must resolve is whether the decision denying benefits was arbitrary and capricious, and the plaintiffs bear the burden of proof. Second, the "exclusion" the plaintiffs appear to be relying on—the absence of medical necessity—is not an exclusion; medical necessity is a threshold requirement for the payment of any benefits under the Plan. (*See* AR 803–04.)

Thus, the plaintiffs' focus on the evidence in the record, provided by J.D.'s medical providers and others, supporting a conclusion that treatment at Villa Santa Maria was medically necessary does little to show that the claims administrator's decision to the contrary was arbitrary and capricious. The test, that is, is not whether the plaintiffs can point to evidence in the record to support their claims—and certainly they can—but whether the denial of benefits is also "supported by substantial evidence." *Durbin v. Columbia Energy Grp. Pension Plan*, 522 F. App'x 341, 346 (6th Cir. 2013) (citing *Balmert*, 601 F.3d at 501). The fact that the plaintiffs are essentially required to prove a negative is not sufficient to warrant shifting the burden to the defendants. *See id.* ("[The plaintiff] also cites several opinions noting that it is difficult to prove a negative, but these cases do not suggest that this is an adequate justification for shifting the burden in an ERISA case.").

## C.     The Merits

As previously stated, the sole question before the court is whether the plaintiffs have carried their burden of showing that the denial of continued coverage for J.D.'s treatment at Villa Santa Maria after May 31 was arbitrary and capricious.[21] The defendants argue that (1) CBA, as mental

---

[21] Of note, the plaintiffs claim a specific amount of monetary damages associated with the costs of maintaining J.D. at Villa Santa Maria, but nowhere in the record do they indicate when he was discharged or how he has fared following discharge.

health claims administrator, appropriately relied on the Continued Stay Criteria for residential treatment in evaluating whether such treatment for J.D. continued to meet the Plan definition of medical necessity; and (2) the denial of coverage for residential treatment after May 31, 2016 is supported by the Administrative Record. (Doc. No. 53.) The plaintiffs contest both of these points, arguing that the Continued Stay criteria conflicted with the Plan's definition of medical necessity and that the record shows that the requested treatment was covered under the Plan. (Doc. No. 59.)

### 1. The Continued Stay Review Criteria

A plan administrator is entitled to rely on internal rules and policies in construing the terms of an employee benefit plan, so long as "these rules or policies reasonably interpret the plan." *Smith v. Health Servs. of Coshocton*, 314 F. App'x 848, 859 (6th Cir. 2009) (citations omitted). The plaintiffs concede as much (*see* Doc. No. 59, at 11 (citing *Smith*, 314 F. App'x at 859)), but they argue that, in this case, CBA, as the mental health claims administrator, erroneously applied an "acute behavior symptom requirement" for treatment at the residential treatment center level of care. (Doc. No. 59, at 12.) They argue that J.D. did not require "acute" care and that this standard applies only when the patient is engaging in behavior that poses "an imminent risk of serious harm to self or others," in which event the appropriate level of care would be in-patient hospitalization. (*Id.*) J.D., instead, was relatively stable and required care at the residential treatment center level of care, which is appropriate for "'individuals who do not pose an imminent risk of serious harm to self or others' yet still require 'safe and stable living environments and 24-hour care.'" (*Id.* (quoting *Wit v. United Behavioral Health*, No. 14-CV-02346-JCS, 2019 WL 1033730, at *16 (N.D. Cal. Mar. 5, 2019)).)

The first problem with the plaintiff's reliance on the *Wit* opinion is that its references to generally accepted standards of care and to the varying levels of care appropriate for different behavioral acuity levels were based on actual evidence in the record in that case—in particular the

American Society of Addiction Medicine ("ASAM") Criteria—which is not part of the record (nor is addiction at issue) in this case. As the defendants point out, "[t]he correct inquiry is whether Defendants' denial of continued residential treatment for J.D. for lack of medical necessity was arbitrary and capricious under *this* Plan and *these* facts." (Doc. No. 62, at 4.) The plaintiffs have relied on *Wit* as if it established universally accepted standards of care for various treatment levels. This reliance is unwarranted.

Second, even assuming the criteria applied in *Wit* are relevant in this case, the plaintiffs have not shown that CBA applied an inappropriate standard. It is true that Brian Still, M.D., who conducted the review on the second appeal, observed that J.D.'s record did not contain "reports of any acute psychiatric symptoms that would have continued to require [residential treatment] level of care" such as "suicidal behavior, suicidal intent, mania, psychosis or depression" that would suggest he was in "acute danger if he were outside of a 24 hour level of care environment." (AR 323.) As the plaintiffs argue, in-patient hospitalization likely would be the appropriate level of care for a patient at that acuity level. However, Still did not deny coverage of continued residential treatment solely on that basis. He went on to note that J.D. "continued to display oppositional behaviors which were chronic in nature" but that the record did not contain "evidence that a realistic expectation of improvement remained from the treatment being provided." (AR 323.) He concluded that, in light of J.D.'s specific diagnoses, he "needed behavior-based therapy that would be most appropriately conducted on an outpatient basis with aggressive family involvement," which was not occurring due to the geographical distance between J.D.'s parents' homes and the residential treatment center. (AR 323.) In other words, Still found that the residential treatment center level of care was not medically necessary because he believed that J.D.'s symptoms could

be appropriately managed at a lower level of care.[22] Notably, the Plan defined medically necessary treatment as treatment that was "clinically appropriate in terms of . . . site" and "effective for the patient's condition." (AR 792.)

Insofar as the plaintiffs are attempting to argue that Criterion 4 of the Continued Stay Review Criteria inappropriately requires "acute" symptoms to justify residential treatment center care ("There is a reasonable expectation of further improvement in the targeted acute behavioral health symptom(s) with continued treatment at this level of care that only this level of care can provide." (AR 3)), the court is not persuaded. As the defendants argue, acuity of care is on a continuum, and there is no inherent bright-line distinction between "acute" and "sub-acute" care. Rather, in-patient care at a hospital requires more "acute" symptoms and more intensive care than a residential treatment center, which requires more acute symptoms and more intensive care than an outpatient clinic. (*See* Doc. No. 58, at 13–14.) The record does not support the plaintiffs' argument that CBA improperly required a showing of inpatient-level acuity to justify residential treatment. And the plaintiffs themselves implicitly recognize that acuity falls on a spectrum, as they argue that J.D.'s symptoms continued to be sufficiently acute to warrant residential treatment.

The defendants have established that it was not arbitrary and capricious to use review criteria to assess medical necessity, and the plaintiffs have not shown that the criteria conflicted with the terms of the Plan.

### 2. *The Denial of Coverage Is Supported by the Administrative Record*

The defendants maintain that the denial of coverage was made thoughtfully rather than

---

[22] In addition, following Still's review and the decision upholding the denial of care, the plaintiffs sought external review of the decision, which was conducted by Dane Street. Dane Street's reviewer likewise concluded that "[t]he medical records do not indicate that the patient would further benefit from residential treatment center level of care" and that "[a] more chronic setting is appropriate for this member." (AR 647.)

hastily, was based on close review of J.D.'s diagnoses, clinical progress, and treatment plan, and, accordingly, cannot be characterized as arbitrary and capricious. In that regard, the record reflects that, after the initial review by Burgess, the denial decision was reviewed and upheld initially and on expedited appeal by three different psychiatrists, on appeal, by a registered nurse and another psychiatrist, and, in the independent review, by yet another psychiatrist. These practitioners consistently concluded, based on the clinical evidence in the record, that J.D. was not exhibiting symptoms indicating that acute danger would result from transfer to a lower level of care; the chronic nature of J.D.'s behavioral symptoms did not provide a reasonable expectation of improvement; and J.D.'s particular diagnoses would be most appropriately addressed on an outpatient basis with in-home help and "aggressive" family involvement. (AR 323, 618.)

As the defendants argue, the opinion of Dr. Pentz is not entitled to deference, and CBA was not obligated to wait until Dr. Pentz was available to conduct a second peer-to-peer before concluding that the requirements of medical necessity were no longer met. As set forth above, the treating physician rule does not apply in ERISA cases, and "[it] is not unreasonable . . . for a plan administrator to give greater weight to its own consultants' determinations than to the recommendation of the beneficiary's own doctor." *In re: Campbell*, 116 F. Supp. 2d 937, 950 (M.D. Tenn. 2000) (citation omitted). While Dr. Pentz expressed her opinion that residential treatment was preferable and that J.D. continued to exhibit "alarming" behaviors, she did not address the reviewers' concerns about J.D.'s participation in serial programs away from home for an extended period of time or that remote, out-of-state treatment could not adequately address his symptoms or the need for greater family involvement in his treatment.

The plaintiffs also argue that the denial of coverage was unreasonable because it did not take into account J.D.'s multiple diagnoses, the risk of regression if he was prematurely

discharged, and the fact that, even as late as December 2016, he continued to require holds that could not have been safely and effectively administered at a lower level of care. The final review by Dane Street refutes each of these claims. Dr. Girgis listed the information he had reviewed, which specifically included Villa Santa Maria treatment notes from Aaron Bowers and Judith Pentz from the summer of 2016, Dr. Pentz's August 31, 2016 letter, and Hilary S.'s December 16, 2016 letter, among other items. (AR 646.) Girgis summarized J.D.'s background, multiple diagnoses, and Pentz's note stating that, as of August 31, 2016, J.D. "continued to have alarming behaviors that continued to warrant 24-hour supervision and structure while at the same time [he] was responding well on several levels to this type of treatment and the interventions offered, and was making progress commensurate with the length of stay." (AR 647.) Girgis also acknowledged the plaintiff's mother's assertion that J.D. continued to need therapeutic holds that could not be safely administered at home and the lack of other treatment options for his symptoms closer to home. (AR 647.) Girgis nonetheless concluded, based on other evidence in the record, that J.D. "had been treated with numerous medication and behavioral regimens with little success" and that the medical evidence did not suggest that J.D. would "further benefit from residential treatment center level of care." (AR 647.) [23]

If this court were reviewing the record *de novo*, the plaintiffs' arguments regarding medical

---

[23] The plaintiffs, again, rely on *Wit* to argue that the generally accepted standards of medical practice required that "[r]esidential care should be considered for those children and adolescents who present with prolonged and chronic symptoms that have not responded to acute, short-term hospitalization," that practitioners should "err on the side of caution by placing the [adolescent] patient in a higher level of care" whenever there is "ambiguity as to the appropriate level of care," and that practitioners should "relax 'the threshold requirements for admission and continued service at a given level of care' when treating adolescents," who are "likely to need longer duration of treatment than adults." (Doc. No. 59, at 12, 15, 16 (quoting *Wit*, 2019 WL 1033730, at *16, 21, 29).) Common sense would seem to support each of these statements, but the plaintiffs have not pointed to any actual evidence in the record that these are universally accepted standards or that they necessarily applied in this case.

necessity would make some headway. Under the extremely deferential review that applies to the decision in this case, however, the court cannot conclude that the denial of benefits was arbitrary and capricious. It is clear from the record that CBA's reviewers made an individualized assessment of J.D.'s situation and his treatment records to conclude, based on his diagnoses, that outpatient treatment with "aggressive" family involvement was the more appropriate treatment for his symptoms and that he was not continuing to make substantial progress while in residential treatment. The conflict between CBA's clinicians' opinions and that of Dr. Pentz amounts to a reasonable disagreement about the appropriate treatment for a given condition. Regardless of whether the court agrees with that determination, it was not arbitrary and capricious. The defendants are entitled to judgment in their favor and dismissal of the claim challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B).

## III.     SECOND CAUSE OF ACTION: VIOLATION OF THE PARITY ACT

Both parties seek judgment in their favor on the plaintiffs' claim based on the defendants' alleged violation of the Parity Act. (Doc. No. 49, at 22; Doc. No. 54, at 20.)

The Parity Act, 29 U.S.C. § 1185, was enacted in 2008 as an amendment to ERISA. It was intended to "end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical conditions in employer-sponsored group health plans." *AK v. Behavioral Health Sys., Inc.*, 382 F. Supp. 3d 772, 773 (M.D. Tenn. 2019) (internal quotation marks and citations omitted). "Essentially, the Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone." *Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018). Although the Parity Act itself does not incorporate a private right of action, portions of it are "incorporated into ERISA and may be enforced using the civil enforcement provisions in ERISA." *Id.* Moreover, because a Parity Act violation entails a substantive violation of ERISA rather than simply a violation of the terms of a

benefit plan, the court's consideration of a Parity Act claim owes no deference to the defendants' interpretation of the plan. That is, the court's review is *de novo*. *Stone v. UnitedHealthcare Ins. Co.*, 979 F.3d 770, 774 (9th Cir. 2020). The burden of proof is on the plaintiff. *Id.*

The Parity Act's implementing regulations target and prohibit specific unequal "treatment limitations." *See* 29 U.S.C. §§ 1185a(a)(3)(A)(ii)–(B)(iii) (defining "treatment limitations"). Treatment limitations include "both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 29 C.F.R. § 2590.712(a). Nonquantitative treatment limitations on benefits include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness" and "[r]efusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or step therapy protocols)." 29 C.F.R. § 2590.712(c)(4)(ii). The Parity Act regulations further specify that all "processes, strategies, evidentiary standards, or other factors used in applying" nonquantitative treatment limitations are subject to the statute's parity requirements. 29 C.F.R. § 2590.712(c)(4)(i). As courts have recognized, "[s]uch factors are often not included in an insured's plan terms and are developed during the course of the insurer's coverage decisionmaking to determine whether a given treatment is covered in a specific case. Therefore, plaintiffs often must plead 'as-applied' challenges to enforce their Parity Act rights when a disparity in benefits criteria does not exist on the face of the plan." *Christine S. v. Blue Cross Blue Shield of N.M.*, 428 F. Supp. 3d 1209, 1219 (D. Utah 2019) (citations omitted).[24]

_____

[24] While it is clear that plaintiffs bringing claims under 29 U.S.C. § 1132(a)(1)(B) can sue for money damages, enforcement of the Parity Act must be accomplished through § 1132(a)(3). *Accord Christine S.*, 428 F. Supp. 3d at 1220 (citations omitted). And, under § 1132(a)(3),

The parties agree that, to prove a claim for violation of the Parity Act, the plaintiffs must show that:

> (1) the insurance plan is of the type covered by the Parity Act; (2) the insurance plan provides both medical benefits and mental-health benefits; (3) the plan has a treatment limitation—either quantitative or nonquantitative—for one of those benefits that is more restrictive for mental-health treatment than it is for medical treatment; and (4) the mental-health treatment is in the same classification as the medical treatment to which it is being compared.

*A.G.*, 363 F. Supp. 3d at 840 (citing 29 C.F.R. § 2590.712(c)(2)(i)); *see also Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 54 (W.D.N.Y. 2020). It is clear that the limitations the plaintiffs allege in the Complaint are nonquantitative (Doc. No. 59, at 19), and the defendants concede that the first and second elements are met: the Plan is covered by the Parity Act, and it provides both medical and mental health benefits (Doc. No. 54, at 22). The parties dispute whether the third and fourth elements are satisfied. Thus, given that the plaintiffs bear the burden of proof, for purposes of both parties' motions, the court must determine whether the plaintiffs have produced sufficient evidence to show that the defendants have imposed a nonquantitative treatment limitation that is more restrictive for mental health than for medical treatment (the third element) and that the mental health treatment is in "the same classification as the medical treatment to which it is being compared" (the fourth element). *A.G.*, 363 F. Supp. 3d at 840.

The plaintiffs assert, first, that there is "no question" that the fourth element is met (Doc.

---

plaintiffs can bring an action to obtain equitable relief only. Specifically, they may seek "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter[.]" *Id.* In a case such as this one in which the plaintiffs are no longer covered by the Plan at issue, the equitable relief to which they might be entitled is entirely unclear, and there are no cases addressing what constitutes permissible equitable relief in this type of situation. Neither party addresses that question however, so this court is not called upon to consider it.

No. 59, at 19), as the rules implementing the Parity Act establish that the "proper medical/surgical analog" to residential treatment center care is the skilled nursing facility, the medical treatment with which the plaintiffs seek a comparison. *See L.P. by and through J.P. v. BCBSM, Inc.*, No. 18-cv-1241(MJD/DTS), 2020 WL 981186, at *6 (D. Minn. Jan. 17, 2020) ("[T]he overview to the Final Rules helpfully identifies skilled nursing facilities as the proper analogue to residential treatment facilities." (citing Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68,247 (Nov. 13, 2013))), *report and recommendation adopted*, No. CV 18-1241 (MJD/DTS), 2020 WL 980171 (D. Minn. Feb. 28, 2020). In response, the defendants argue that this is a fact-specific question that must be considered contextually, on a case-by-case basis. (Doc. No. 58, at 17 (citing *Steve C. v. Blue Cross and Blue Shield of Mass.*, 450 F. Supp. 3d 48, 60 (D. Mass. 2020) (concluding that determination of an appropriate analog for a Parity Act claim cannot be analyzed at the Rule 12 stage and likely requires discovery)).) The court finds that, because the implementing regulations establish that skilled nursing facilities provide the proper analogue to residential treatment facilities, the plaintiffs have met their burden of establishing the fourth element. However, as discussed below, the defendants' reference to *Steve C.* and the likely necessity of discovery is relevant to—and dispositive of—the plaintiffs' ability to point to facts to support the third element.

Regarding that factor, the plaintiffs assert that the Plan, as applied, violated the Parity Act by requiring "acute" symptoms when assessing medical necessity under the residential treatment center Continued Care Criteria. As the plaintiffs point out, in denying benefits, the defendants' reviewers frequently concluded that J.D. exhibited "chronic" symptoms that the various reviewers deemed better treated at a lower level of care than the residential treatment center setting. (*See, e.g.*, AR 314–15, 155–56, 608.) At the same time, the Plan Documents provide for coverage of

treatment at a skilled nursing facility if, among other factors, the services are provided in a Long-Term Acute Care Hospital. "Long-Term Acute Care Hospital" is defined as a facility "primarily engaged in providing diagnostic services and medical treatment to Members with chronic diseases and complex medical conditions," typically for patients who "may no longer need general acute care typically provided in a Hospital." (AR 813, 790.) In other words, the plaintiffs argue, "[w]hen CBA denied claims for benefits while using as a justification the chronic nature of [J.D.]'s condition, it treated [his] mental health coverage more restrictively than the plain language of the Plan provides for treatment at the analogous skilled nursing level of care. This is the very type of discriminatory practice that [the Parity Act] was designed to prevent." (Doc. No. 59, at 21.)

The defendants, in response, first argue that the Plan's definition of medical necessity and the Continued Stay Criteria "clearly show that an 'acute' condition is not required for continuing residential treatment under the Plan." (Doc. No. 58, at 13 (citing AR 3).) They also cite to the Plan's definition of a residential treatment center, which does not require "acute" symptoms. (*See* AR 797.) The court is not fully persuaded, as one of the Admission Criteria for residential treatment centers explicitly requires that the patient be "manifesting *acute* behavioral health symptoms which represent deterioration from his or her baseline status that could result in harm," and Criterion 4 of the Continued Stay Criteria likewise requires "a reasonable expectation of further improvement in the targeted *acute* behavioral symptom(s) with continued treatment at this level of care that only this level of care can provide." (AR 2, 3 (emphasis added).) On the other hand, as the defendants also argue, acuity is relative, and, considered in context, the referenced criteria require a different level of acuity than inpatient hospital admission would. That is, the acuity required depends on the level of care at issue: hospital care requires more acute symptoms than residential care, and residential treatment requires more acute symptoms than outpatient

treatment. In addition, while the plaintiffs focus on references to chronicity and acuity, the denial of care in this particular case depended on many other considerations as well, including the absence of evidence of a "realistic expectation of improvement" and the appropriateness of outpatient therapy. (*See* AR 608.) Finally, the defendants argue that the plaintiffs have the burden of pointing to facts in the record that establish the elements of their claim and that they fail to do so.

The court agrees. With regard to the plaintiffs' burden of proof, documentation related to a Parity Act claim will not necessarily be part of an administrative record related to a claim for benefits. As a result, several courts have recognized that documentation to support an "as-applied Parity Act claim rests on facts within [the defendants'] control and requires discovery." *Denise M. v. Cigna Health*, No. 2:19-CV-975-DAK, 2020 WL 3317994, at *2 (D. Utah June 18, 2020); *see also Steve C.*, 450 F. Supp. 3d at 60 (noting that Parity Act claim likely requires discovery). The plaintiffs here apparently did not seek discovery of the defendant's use criteria applied to coverage of care at skilled nursing facilities and have not provided evidence of those use criteria. However, to prove their Parity Act claim, the plaintiffs must do more than simply offer conclusory statements and legal conclusions and must, instead, present actual evidence that the defendants "applied more rigorous medical necessity criteria when evaluating claims for mental health benefits" than when they evaluated analogous medical treatment claims. *Julie L.*, 447 F. Supp. 3d at 58. By putting the Continued Care Criteria for residential treatment centers up against the Plan's provision for care at a Skilled Nursing Facility, without reference to the Continued Care Criteria applicable to treatment in the latter setting, which are not in the record, the plaintiffs are essentially comparing apples to oranges. As the defendants point out, the plaintiffs disregard the Plan's indication that skilled nursing facility services, like residential treatment center services, "may be subject to requirements for Preadmission Review, Emergency Review, and Continued Stay Review." (AR

813.) In other words, claims for skilled nursing facility services for medical/surgical patients, too, are subject to nonquantitative treatment limitations. The plaintiffs do not acknowledge that fact or identify what those limitations are. Instead, they assert, with no citation to the record, that the defendants do not impose acute care criteria on "analogous medical/surgical claimants. (Doc. No. 49, at 23.)

> With regard to nonquantitative limitations, the Parity Act regulations provide that

> [a group health plan may not] impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification, unless . . . any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative limitation . . . are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits.

*Id.* § 2590.712(c)(4)(i). In reviewing the parties' arguments and the record as a whole, the court finds that, even assuming that medical treatment in a skilled nursing facility is the appropriate analog to mental health treatment in a residential treatment center, the plaintiffs have not presented any facts supporting their claim that the defendants imposed nonquantitative treatment limitations for care at a residential treatment center that were more restrictive than treatment limitations in place for care at a skilled nursing facility. The plaintiffs have not identified what "processes, strategies, standards, or other factors" were applied more stringently by the defendants in handling mental health claims as opposed to medical or surgical claims. *Id.* Additionally, the plaintiffs have not provided any facts to show or suggest that a particular process or standard, including the "medically necessary" standard, was applied in a differential way. In short, the plaintiffs have failed to satisfy their burden of proof by pointing to any actual facts that support their claim that there was disparate treatment in the way the defendants handled J.D..'s claim for continued treatment at Villa Santa Maria compared to the way the defendants process or evaluate claims for prolonged treatment at skilled nursing facilities and inpatient rehabilitation centers. *Accord Mike*

*G. v. Bluecross Blueshield of Tex.*, No. 2:17-CV-347 TS, 2019 WL 2357380, at *16 (D. Utah June 4, 2019) ("Plaintiffs argue that the Milliman Care Guidelines improperly apply acute requirements for sub-acute residential mental health treatment, *but there is no evidence before the Court that Blue Cross applied less stringent requirements for medical/surgical benefits.* Without such evidence, Plaintiffs' Parity Act claim must fail." (emphasis added)); *Anne M. v. United Behavioral Health*, No. 2:18-CV-808TS, 2019 WL 1989644, at *3 (D. Utah May 6, 2019) (holding that the plaintiffs' allegations that the subject plan "imposed greater restrictions on residential treatment for mental health than it did for facilities, such as skilled nursing homes," were devoid of factual support and thus were insufficient to state Parity Act claim).

Because the plaintiffs have not presented any evidence regarding the defendants' application of their medical necessity criteria and acuity assessment in the medical/surgical context for purposes of their "as applied" challenge, the defendants' motion for judgment on this claim will be granted, and the plaintiffs' motion will be denied.

## IV. BCBSSC'S MOTION FOR JUDGMENT

Because the court finds that the defendants are entitled to judgment on the merits, the court will grant their Motions for Judgment without reaching BCBSSC's separate argument that it is not appropriately named as a defendant in this action.

## V. CONCLUSION

For the reasons set forth herein, the court will grant the defendants' Motions for Judgment (Doc. Nos. 53, 55) and deny the plaintiffs' Motion for Summary Judgment (Doc. No. 49). An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge